People v Hartman (2024 NY Slip Op 50982(U))

[*1]

People v Hartman

2024 NY Slip Op 50982(U)

Decided on July 18, 2024

Justice Court Of The Town Of Orchard Park, Erie County

Pastrick, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on July 18, 2024
Justice Court of the Town of Orchard Park, Erie County

The People of the State of New York,

against
Frederick C. Hartman, Defendant.

Docket No. 23060198

Nathan Zobrest, Esq.
Erie County District Attorney's Office
25 Delaware Avenue
Buffalo, New York 14202
For defendant:
Robert H. Flynn, Esq.
43 Court Street, Suite 600
Buffalo, New York 14202-3115

Michael J. Pastrick, J.

Defendant, Frederick C. Hartman, has pleaded guilty to a single count of petit larceny (Penal Law § 155.25). Under the circumstances of this case, and for the reasons that follow, the court sentences defendant to a definite term of one year of incarceration (see § 70.15 [1], [1-a] [a]; cf. § 70.35),[FN1]
together with a fine of double defendant's gain from the crime of which he has been convicted ($1,298; see Penal Law § 60.01 [2] [c], § 60.01 [3] [c], and § 80.05 [1], [5]; cf. § 80.00 [2], [3]). 
The court acknowledges that the term of incarceration and the concomitant fine are significant given that defendant has pleaded guilty to only a single class A misdemeanor crime. This case, however, has indicia of organized, for-profit retail theft, which the court characterizes as "coordinated, 'professional' theft of merchandise, [often] involving more than one person, for the purpose of reselling items on the black market for financial gain" (Ames Grawert et al., Myth [*2]v Reality: Trends in Retail Theft, Brennan Center for Justice [March 7, 2024]).[FN2]
Consequently, the court hopes that this punishment is sufficiently repugnant and onerous so as to deter the punished offender and others from committing similar crimes of for-profit retail theft in the future.
I.
Popular culture, be it through video games, movies, or streaming television, sometimes—and always wrongly—depicts notorious criminals of past eras as glamorous, or sensational, or exciting (see Dillinger, LLC v Electronic Arts Inc., 2011 WL 2457678, at **2-3 [SD Indiana, Indianapolis Division, 2011]). But most modern crime typically "would[] [not] make it to post-production" in a video game development company or film studio (Kallen Dimitroff, Organized Prime: Should Amazon be Responsible for its Sellers' Criminal Activity?, 100 Tex L Rev Online 127 [2022]).
Contemporary heists, instead, often "go more like this:" a person of middle age, sometimes working alone, and sometimes working in concert, drives to a retailer located near a highway or on a busy road, enters the store deliberately targeting and quietly taking goods—such as "perfume, cosmetics, toiletries or power drills"—that can be easily resold and converted to cash online (id.; see Siddharth Cavale, Explainer: 'Organized' Retail Crime: A 'Multi-Billion Dollar Problem,' [June 29, 2023]).[FN3]
"Retailers and law enforcement all over the country ha[ve] [made] efforts to stop [such] criminal networks" (Dimitroff, Organized Prime: Should Amazon be Responsible for its Sellers' Criminal Activity?, 100 Tex L Rev Online 127 [2002]), and with good reason. 
"Before the world was wired, people who resold items, stolen or not, usually had to use their names or show their faces" (Simone Eichselbaum and Andrew Blankstein, 'It's an Easy Fast Dollar': How Organized Retail Theft Rings in one Ohio Town use Facebook Marketplace to [*3]Sell Stolen Goods, NBCNews.com, December 31, 2021).[FN4]
"The internet," however, "changed everything" (id.). "For the past two decades, law enforcement has struggled to keep up as one [online] platform succeeded another as the preferred marketplace for stolen goods" (id). According to one recent estimate, domestic retailers annually lose between $40 billion and $68 billion to external theft, including organized retail crime (cf. Gabrielle Fonrouge, et al., Inside the Organized Crime Rings Plaguing Ulta, T.J. Maxx, Walgreens and Other Retailers, NBCNews.com [March 12, 2024][FN5]
 with Dimitroff, Organized Prime: Should Amazon be Responsible for its Sellers' Criminal Activity?, 100 Tex L Rev Online 127 [2002] and New York State Senate, 
https://www.nysenate.gov/legislation/bills/2023/S6334 [last accessed July 2, 2024]).
The cost of that theft is directly and indirectly borne by consumers. Competition in the retail field frequently requires merchants—especially small business bereft of the negotiating power of their larger counterparts—to operate on thin margins, such that even a nominal theft may require considerable sales volume to make up for value lost due to stolen items.[FN6]
Those thin margins, and the volume of larcenies at some locations, require retailers to take significant, often visible countermeasures to theft, such as the holding of basic items under lock and key, the installation of security cameras, and the use of motion sensors. Those methods sometimes are invasive, frequently, "impact[] people's perceptions of safety," and almost certainly chill commerce and patronage at brick-and-mortar locations (see Grawert, Myth v Reality: Trends in Retail Theft, Brennan Center for Justice [March 7, 2024]).
Compensating for organized, for-profit retail theft also occurs in other ways. Many of the same businesses respond to theft through costly measures including the increased use of background checks on hires, the implementation of inventory control systems, the alteration of inventory, and the reduction of hours of operation (see Jason Metz, The Impact of Retail Theft on Small Businesses and States, Forbes Advisor [June 10, 2024][FN7]
; New York State Senate, 
https://www.nysenate.gov/legislation/bills/2023/S6334 [last accessed July 2, 2024]). The [*4]economic consequences of those maneuvers eventually reaches consumers subject to higher prices on items that sometimes include necessities such as food. Those price increases, of course, tend to impact most greatly low- and middle-income families without the budget and purchasing elasticity to absorb higher costs.
Employees, too, are affected by organized retail crime. While it may be that some estimates suggest that, on a broad, national level, the occurrence of larcenies has largely decreased since 1990,[FN8]
shoplifting incidents have "surged" or "risen dramatically" in some areas between 2019 and 2023 (see id.; Metz, The Impact of Retail Theft on Small Businesses and States, Forbes Advisor [last accessed July 2, 2024]).[FN9]
And, "there is . . . an undeniable qualify-of-life impact from the real or perceived increase in shoplifting" experienced not only in our communities, but by retail personnel (Pamela Paul, What We Lose to Shoplifting, New York Times [Aug. 10, 2023]).[FN10]

That effect is felt in at least two significant ways. Employee compensation, or at least some flexibility to increase compensation for employees, obviously suffers because of retail crime. According to one estimate, as recently as 2019, lower sales occasioned by retail theft translated to hundreds of thousands of fewer jobs and nearly $40 billion in lost wages and benefits (see Retail Industry Leaders Association, https://rilastagemedia.blob.core.windows.net/rila-web/rila.web/media/media/ campaigns/buy%20safe%20america/fact%20sheets/the-impact-of-organized-crime-and-theft-in-the-united-states.pdf [last accessed July 3, 2024]). 
The physical safety of retail workers also has become an area of concern. "Most people who work in stores expect to fold shirts, restock shelves[,] and handle customer requests—not to confront brazen and sometimes hostile shoplifters or organized theft rings" (id.). But working in an environment of prevalent shoplifting can be stressful and, worse yet, dangerous (see id.). What ostensibly was a spike in violence against retail employees prompted the enactment of Penal Law § 120.19, which becomes effective on October 17, 2024 and which will elevate to felonies certain assaults upon retail workers (see Penal Law § 120.19 [1]; cf. Penal Law § 120.00 [1]). 

II.
This jurisdiction is not immune to those issues. The court is comfortable taking judicial notice (see People v De Loach, 58 Misc 2d 896, 898-899 [Buffalo City Ct 1969]) of geography of this jurisdiction attractive to professional or enterprise thieves. At least seven "big box" retailers are strategically located either adjacent to an expressway linked to one of the largest and most-traveled highway systems in the United States or on a principal arterial capable of handling traffic consisting of over 20,000 vehicles on a given day (see New Stadium Traffic Assessment, 
https://www3.erie.gov/environment/sites/www3.erie.gov.environment/files/2024-06/17-traffic-assessment-web.pdf July 8, 2024]). By their very nature, those locations are designed to host retailers that use the convenience of easy vehicular access to draw shoppers from a wide geographic area.
That convenience, however, also attracts criminals. The court's own files reflect a growing trend in which that ease of access appears to entice thieves from other areas.[FN11]
 The vast majority of the larceny charges (see Penal Law article 155) that came before this court within the past 18 months have some or all of these common characteristics:
* They originate from a "big box" retailer at a shopping center located near a Route 219 interchange;
* The goods stolen consist of items (for example, scooters, shampoo, liquor, makeup, sporting goods or apparel, Apple products, and Amazon Fire Sticks) that the court understands to be attractive to "black market" buyers;
* The defendant drives or is driven to one of those locations from an area outside of Orchard Park and, sometimes, outside of Erie County;
* The value of the property stolen totals in the hundreds of dollars, but is frequently just marginally less than the $1,000 threshold at which the charges elevate from the class A misdemeanor of petit larceny (Penal Law § 155.25) to the class E felony of grand larceny in the fourth degree (§ 155.30 [1]); and
* The defendant has either a prior criminal record, or pending criminal charges, involving theft-based offenses (see Penal Law article 155).
Some of those charges have less common, but still notable, characteristics. At least two [*5]of those charges (the court reviewed approximately 100 files in conducting this analysis) involved a police chase—something the court notes is fraught with danger for a variety of reasons that require no articulation. Only a handful of those matters involved the theft of food, and none of the cases outwardly reflected struggle or concern with sustenance inasmuch as the fare alleged to have been stolen typically consisted of large amounts of seafood or meat. 
Mental health and addiction likely are factors in a critical mass of the larceny charges reviewed by the court. In those instances, and only where appropriate given the nature of the charges, the defendant's criminal history, and the defendant's background, the court has encouraged defendants to explore—and sometimes referred defendants to—various community resources, including the Assigned Counsel social work program and pertinent problem-solving courts. The latter of those mechanisms provide "intensive judicial monitoring, coordination with outside services, [and] treatment where [suitable]" in advance of adjudication, with the goals of resolving "the underlying issues that bring [those] people into the court system" and "enhancing public safety" (New York State Unified Court System, Problem Solving Courts, 
https://ww2.nycourts.gov/COURTS/problem_solving/index.shtml
[last accessed July 10, 2024]).[FN12]

 III.
The court now turns to this case. Defendant stands convicted of one count of the class A misdemeanor of petit larceny (Penal Law § 155.25, under Docket No. 23060198) pursuant to a plea of guilty that satisfied two counts of petit larceny pending against him in this court. 
The first of those charges (Docket No. 23060199) arose from an incident that occurred on the evening of March 17, 2023. A senior asset protection manager (SAPM) for the store at issue affirmed that, on the date and time in question, he "observed a white Cadillac sedan enter the parking lot of th[at] [location] and park beyond camera view on the lumber side of the building." Shortly thereafter, the SAPM "observed a [man later identified as defendant] enter the store through the Lumber entrance[,] . . . walk to the Tool Department, select a DeWalt combo kit [with a value of $549, and] cut the security cable[. Defendant then] pass[ed] all points of sale and exit[ed] the store through the Lumber Exit with the DeWalt combo kit still in his possession" and "without [having paid] for th[at] merchandise." Defendant subsequently left the scene in the Cadillac automobile.
The second of those charges (Docket No. 23060198) arose from a nearly identical and equally brazen incident alleged to have occurred two days later at the same entrance and exit of the same store and involving what the court understands to be a nearly identical item. The same SAPM affirmed that, on the evening of March 19, 2023, he "observed a white Mid-Size SUV without a license plate enter the parking lot of that store . . . and park under the Lumber Canopy." Shortly thereafter, a man later identified as defendant entered that store, "walk[ed] to [*6]the Tool Department, select[ed] a DeWalt combo kit [with a value of $649], cut the security cable, and then proceed[ed] with the merchandise toward [the same exit through which he entered that establishment] without paying for the merchandise."
Those alleged thefts and the arrest that flowed therefrom were not defendant's first involvement with the criminal justice system. By the time those incidents are alleged to have occurred, defendant had been arrested 20 times and, more importantly, had six prior felony convictions (one of which was a violent felony), two prior misdemeanor convictions, and three convictions of a violation. The court notes that those prior convictions include attempted robbery in the second degree (§§ 110.00, 160.10 [2] [b]), robbery in the third degree (Penal Law § 160.05), attempted burglary in the third degree (§§ 110.00, 140.20), grand larceny in the third degree (§ 155.35), and grand larceny in the fourth degree (§ 155.30 [1]). The court also notes that, shortly after the instant crimes are alleged to have occurred, defendant faced theft-based charges in four neighboring jurisdictions: grand larceny in the fourth degree (§ 155.30 [1]) in West Seneca and Cheektowaga; grand larceny in the second degree (§ 155.40 [1]) and burglary in the third degree (§ 140.20) in Elma; and criminal possession of stolen property in the second degree (§ 165.52) in Buffalo.
Absent from that backdrop is any evidence that the crime in question here is an individual effort prompted by a lack of food or clothing. Instead, the constellation of circumstances here leads the court to conclude that the petit larceny charge of which defendant was convicted has the indicia of organized, for-profit theft. Based upon all of the foregoing factors, the court, in relevant part, imposes the maximum available sentence of one year of incarceration (see Penal Law § 70.15 [1], [1-a] [a]), together with the maximum available fine of double defendant's gain from the crime of which he has been convicted ($1,298, pursuant to Penal Law § 60.01 [2] [c], § 60.01 [3] [c], and § 80.05 [1], [5]).[FN13]

 IV.
This optimistic component of this court historically has believed that it is sometimes appropriate to see things not for what they are, but for what they can be. Courts such as this one adjudicate a broad range of matters and likely handle "the vast majority of criminal proceedings [*7]in this state" (Brief for amicus curiae in People v Franklin, — NY3d —, 2024 NY Slip Op 02227 [April 25, 2024], at **10-11).[FN14]
The utility—and potential—of local courts such as this one lie in the ability to find in those many cases the opportunity to help, for example, certain justice-involved veterans struggling with the return to civilian life through a referral to a Veterans Treatment Court. Tribunals such as this one also have tools to assist low-level, non-violent, non-professional offenders struggling "with post-COVID mental health issues and the unprecedented opioid epidemic that tears at the social fabric of our society" (id. at *3).
And, courts like this one can serve societal good by crafting sanctions that protect the public and that deter others from engaging in similar misconduct (see Matter of Haar, 227 AD3d 1364, 1366 [3d Dept 2024]). This court has and will likely continue that approach with respect to the "very serious crime" of driving while intoxicated that "has caused many tragic consequences" (People v Washington, 23 NY3d 228, 231 [2014] [internal quotation marks omitted]) and that, because of the unique venue that it hosts, is a unique consideration in this community. It takes the same approach in what appears to be this instance of for-profit retail theft. 
This is an appropriate case in which to make an example and to issue a warning (cf. generally Penal Law § 70.35). The court hopes that the sentence of the maximum term of one year of incarceration relative to the theft of two "combo [drill] kits" tells recidivist, profit-seeking thieves that the consequences of those actions are significant and that they will be held accountable. The court also hopes that the imposition of both the maximum term of incarceration and the maximum available fine discourages others from engaging in professional criminal conduct that in this jurisdiction now carries the real risk of a long sentence of imprisonment and a heavy financial penalty (see generally People v Snowden, 160 AD3d 1054, 1057 [3d Dept 2018]). 
Accordingly, for all of the foregoing reasons, and in view of all of the foregoing circumstances—including those discussed at the sentencing hearing—the court, in relevant part, sentences defendant to the maximum definite term of one year of incarceration and imposes a fine of double defendant's gain from the crime of which he has been convicted ($1,298; see Penal Law § 60.01 [2] [c], § 60.01 [3] [c], and § 80.05 [1], [5]; cf. § 80.00 [2], [3]). 
Dated: July 18, 2024
Hon. Michael J. Pastrick

Footnotes

Footnote 1:Consistent with its options and obligations under the Penal Law, the Court also imposes a mandatory surcharge of $180, a crime victim assistance fee of $25 (see § 60.35 [1] [a] [ii]; § 60.35 [9]), and a $50 DNA databank fee (see Executive Law § 995 [7]; Penal Law § 60.35 [1] [a] [v]). Defendant must provide a DNA sample by the public servant to whose custody defendant has been committed (see Executive Law § 995-c [3] [a]; § [3] [b] [i]). 

Footnote 2:Available at 
https://www.brennancenter.org/our-work/research-reports/myth-vs-reality-trends-retail-theft (last accessed July 2, 2024).

That definition, the court notes, is consistent with the characterization by the United States Department of Homeland Security of "organized retail crime" as "the association of two or more persons engaged in illegally obtaining items of value from retail establishments, through theft and/or fraud, as part of a criminal enterprise" (see New York State Senate, 
https://www.nysenate.gov/legislation/bills/2023/S6334 [last accessed July 2, 2024]). No matter the verbiage used to characterize organized, for-profit retail theft, the court notes that such crime "does not comprise [takings] such as one individual shoplifting due to a lack of food or clothing," and instead "is more about . . . people turning a profit from the mass theft of retail items" (id.).

Footnote 3:Available at 
https://www.reuters.com/business/retail-consumer/organized-retail-crime-multi-billion-dollar-problem-2023-0629/#:~:text=NEW%20YORK%2 C%20June%2029%20%28Reuters%29%20-%20Top%20executives%20often%20 perfume%2C%20cosmetics%2C%20toiletries%20or%20power%20drills
(last accessed July 1, 2024).

Footnote 4:Available at 
https://www.nbcnews.com/news/crime-courts/organized-shoplifting-rings-work-police-one-ohio-town-are-fighting-bac-rcna9802 (last accessed July 1, 2024).

Footnote 5:Available at 
https://www.nbcnews.com/news/us-news/organized-crime-rings-plaguing-retailers-ulta-tj-maxx-walgreens-rcna142919 (last accessed July 1, 2024).

Footnote 6:For example, the court notes that if a retailer has a 1% profit margin and a shoplifter steals an item that is worth $1, then the retailer must sell $100 of goods to recover the loss from that theft. According to one estimate, goods stolen from retailers on an annual basis total 1.47% of all sales, and equate to $214 per capita nationwide (see U.S. Chamber of Commerce, 
https://www.uschamber.com/economy/retail-crime-data-center#:~:text=Organized%20retail%20crime%20has%20a%20significant %20 impact%20across,economic%20losses%20nationwide%20%2439.2B%20in%20lost%20wages%20nationwide [last accessed July 3, 2024]).

Footnote 7:Available at 
https://www.forbes.com/advisor/business-insurance/impact-retail-theft-on-small-businesses/ (last accessed July 2, 2024).

Footnote 8:This point is based on FBI crime data reflecting that, for the period from 1990 to 2022, larceny offenses per 100,000 people decreased on a national level by approximately 50%. That study, however, also reflects a slight rebound in larceny offenses between the years 2021 and 2022. 

More importantly, that data does not distinguish between shoplifting, retail theft, and other types of theft (see Metz, The Impact of Retail Theft on Small Businesses and States, Forbes Advisor [June 10, 2024]). And, the same data does not account for "notable spikes [of such activity—that is, the targeting of certain stores and facilities—] in some [areas]" (id.) 

Footnote 9:Recent circumstances in Perrysburg, Ohio, starkly illustrate both a localized surge and the nature of the problem posed by organized, for-profit retail theft. That community of approximately 13,000 people is dotted by farms—and, by virtue of its location off both the Ohio Turnpike and Interstate 75—big-box retailers that may be both easily accessed and easily fled. 

Those geographic characteristics present shoplifting crews with the opportunity for an "easy fast dollar." There, the theft and resale of power tools could yield $2,500 in profit in a single day—an endeavor that one person convicted of such activity noted was more profitable and less risky than selling drugs. And, the pervasiveness of that criminal activity at one point "monopolize[d]" the time of local law enforcement such that "nearly all of [its] investigations . . . involve[d] suspects who [sold] their stolen items online" (Eichselbaum et al., 'It's an Easy Fast Dollar': How Organized Retail Theft Rings in one Ohio Town use Facebook Marketplace to Sell Stolen Goods, NBCNews.com, December 31, 2021).

Footnote 10:Available at https://www.nytimes.com/2023/08/10/opinion/shoplifting-urban-safety.html
(last accessed July 2, 2024).

Footnote 11:The court acknowledges that there is some guesswork in its analysis of the etiology of shoplifting charges in this and other jurisdictions inasmuch as criminal intent and motive typically cannot be inferred through direct evidence and instead must be discerned from the defendant's conduct and the surrounding circumstances (see People v Rodriguez, 17 NY3d 486, 489 [2011]; People v Bracey, 41 NY2d 296, 301 [1977], rearg denied 41 NY2d 1010 [1977]).

Footnote 12:With respect to these issues, the court notes that at every arraignment every defendant are provided information with respect to the aforementioned social work program, the "Rapid Evaluation for Appropriate Placement" initiative designed to combat the nationwide infestation of opioids including fentanyl, and an explanation of the various problem-solving courts—including Veterans,' Mental Health, DWI, Drug, and Opioid Courts—operational in Erie County. Referrals to such programs are available to appropriate low-level, non-violent, and "non-professional" defendants. 

Footnote 13:In so sentencing defendant, the court is mindful of the importance of promoting restorative justice in appropriate circumstances (see People v Greene, 41 NY3d 950, 955-956 [2024] [Wilson, C.J., concurring]). This matter, however, is not one in which "reflexive incarceration" (id. at 956) or a "disproportionate result" (id. at 952) flows from "minor antisocial behavior" (id.). And, the court notes, these circumstances do not warrant the conciliatory approach to justice perhaps germane to fleeting, minor, and isolated transgressions (see id. at 955).

The court also notes its awareness of the value of and emphasis placed upon problem-solving courts (see Brian Lee, Wilson Issues Call for 'Problem-Solving' Mandate in New York Courts, New York Law Journal, Feb. 27, 2024, available at 
https://www.law.com/newyorklawjournal/2024/02/27/wilson-issues-call-for-problem-solving-mandate-in-new-york-courts/
[last accessed June 6, 2024]). Participation in those courts should—as this tribunal frequently does (see pages 9-10 of this writing)—be encouraged in appropriate circumstances. This is not, however, an suitable scenario for such a placement in view of defendant's lengthy criminal history, the violence in that background, and the for-profit nature of the instant criminal activity.

Footnote 14:"At the trial court level, 696,426 criminal cases, including parking and traffic tickets that required the court's involvement, were filed in Supreme Courts, County Courts, the Criminal Court of New York City, and City and District Courts (see New York State Unified Court System, 2022 Annual Report, available at 
https://www.nycourts.gov/legacyPDFS/22_UCS-Annual_Report.pdf 
[accessed Feb. 28, 2024]). As of 2023, the town and village courts of this state handle nearly one million cases annually (see New York State Unified Court System, Introduction-Town and Village Courts, available at https://www.nycourts.gov/courts/townandvillage/introduction.shtml [accessed Feb. 29, 2024J) —a significant majority of which likely are of a criminal nature" (Brief for amicus curiae in People v Franklin, — NY3d —, 2024 NY Slip Op 02227 [April 25, 2024], at *11 n 13).